Filed 8/11/25  In re R.G. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re R.G., a Person Coming Under the Juvenile Court Law. | B338205 |
| | (Los Angeles County Super. Ct. No. 24CCJP01128) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| D.G., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge.  Affirmed.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

Tarkian & Associates and Arezoo Pichvai for Plaintiff and Respondent.

———————————————

**INTRODUCTION**

D.G., mother of R.G. (born 2015), appeals the juvenile court's order under Welfare and Institutions Code section 300, declaring R.G. a dependent of the court, removing R.G. from her custody, and ordering her to participate in services, including mental health counseling and a psychiatric evaluation.[1] D.G. argues the court lacked substantial evidence for its jurisdiction findings that D.G. and Brian G., R.G.'s father, engaged in domestic violence and abused alcohol. D.G. also argues there was no substantial evidence for removing R.G. or ordering her psychiatric evaluation. We conclude substantial evidence supports the juvenile court's jurisdiction and disposition orders and affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

A. *The Dependency Petition*

On February 24, 2024, the Los Angeles County Department of Children and Family Services (Department) received a referral from the Whittier Police Department of domestic violence between D.G. and Brian in the presence of R.G.[2] The police

———————————————

[1] All statutory references are to the Welfare and Institutions Code.

[2] Brian is not a party to this appeal.

2

report stated that D.G. and Brian were married and lived together with R.G.  On the date of the incident, D.G. and Brian argued over the location of D.G.'s keys and wallet and her plans to go out with some friends, including a "male friend."  "The verbal argument then became physical, as Brian pulled [D.G.] by her hair and then pushed her onto the bed.  [D.G.] would get up from the bed, and Brian would push her onto the bed again.  [D.G.] estimated she was pushed onto the bed approximately five times.  Brian also struck [D.G.]'s face approximately six times.  These strikes caused [her] to feel pain and puffiness to her lips; they also caused a bruise . . . to [her] left cheek."  The altercation moved from Brian and D.G.'s bedroom to R.G.'s bedroom, where R.G. was present, and Brian pushed D.G. onto R.G.'s bed.  When D.G. tried to leave their home, Brian "took the living room couch and placed it in front of the front door."

Eventually, D.G. was able to leave the apartment, and she walked to the police department and reported the incident.  D.G. told police there had been "multiple instances of domestic violence" and that "Brian was supposed to be in a rehabilitation program for his alcoholism."  D.G. said "Brian likely sustained scratches to his face and upper body, because she was trying to defend herself."  D.G. stated that "Brian has a good relationship with [R.G.]" and she was not concerned that she left R.G. alone with Brian.

Police officers from the Whittier Police Department interviewed Brian the same day.  Brian reported that D.G. "had bipolar disorder and was intoxicated that morning," and he "did not feel [she] was in condition to leave home or to operate a motor vehicle, so he took [her] keys," causing an argument.  Brian denied engaging in physical violence and was "unsure how [D.G.]

3

sustained a bruise to her face." He stated that D.G. had "pushed him repeatedly" but that he was not injured.

A police officer also interviewed R.G. R.G. confirmed that he saw his parents arguing that day because "his dad thought his mom was going to leave the house to visit someone that she wanted to marry instead of his dad." R.G. reported that his dad had consumed "adult drinks" that day. R.G. stated "both [D.G.] and Brian pushed and hit each other," "he thought his parents were hitting each other in the legs," and "his dad pushed his mom onto the living room couch." R.G. told the interviewing officer that his parents had "argued and hit/pushed each other like this in the past."

Police officers arrested Brian for assault and false imprisonment. The police report noted "a small bruise on Brian's left cheek," "a small scrape on Brian's nose," "red marks on the left side of Brian's neck and red marks on Brian's chest and stomach." Brian repeated to officers that D.G. had a "drinking problem" and that she "punched him and pushed him," causing these injuries. Brian described that D.G. had "assaulted him previously, but he never reported these incidents to law enforcement."

On April 10, 2024, the Department filed a section 300 petition alleging risk of serious physical harm to R.G. (§ 300, subd. (a); allegation a-1) and failure to protect R.G. (§ 300, subd. (b); allegation b-1) because D.G. and Brian "have a history of engaging in violent physical altercations in the presence of the child." The petition further alleged D.G. currently abused alcohol and prescription medication such that she was incapable of providing regular care and supervision and that Brian failed to protect R.G. from D.G.'s substance abuse (§ 300, subd. (b);

4

allegation b-2). The petition alleged that on March 26, 2024, "mother had a positive toxicology screen for Benzodiazepine prescription medication." In allegation b-3, the Department asserted that Brian also currently abused alcohol, affecting his ability to care for R.G., and that D.G. failed to protect R.G. from Brian's substance use.

After a hearing, the juvenile court detained R.G. from D.G. and Brian.

B.     *The Department's Jurisdiction and Disposition Reports*

The Department investigated the allegations in preparation for a combined jurisdiction and disposition hearing. The Department interviewed nine-year-old R.G., who reported that when his parents "got mad at each other," "Mom hit[s] dad . . . [o]n the face with her hands. She slaps him." R.G. did not know who started the arguments or why they happened. R.G. stated, "One day my mom and dad got into an argument. My mom was going somewhere with a friend. My dad didn't want to let her go. She was drunk. When the argument happened, dad pushed the couch to the door. My mom was not able to squeeze through so she went to the police." R.G. recalled that on this day, "Dad pushed mom onto the bed" but he did not know whether there was "any hitting between them" and did not think Brian hit D.G. R.G. stated he wished his mother would "[n]ot be drunk" or "fight dad." R.G. stated he did not know if he would change anything about his father because "[h]e doesn't really do anything to mom." When asked if he felt safe living with his parents, R.G. replied, "A little. I have a bad feeling they are going to fight again."

5

The Department also asked R.G. about his parents' substance use. R.G. reported both his parents drank alcohol but "[t]hey both stopped." R.G. described that his father was "[n]ormal" and "passes out" when he drinks but stated his mother "gets crazy" and "says weird things." R.G. denied that his mother was "aggressive" when drinking but stated he "can tell by her expressions" when she is drunk. R.G. said he takes care of himself when his parents are drinking and that "[m]aybe" his parents "have a problem with drinking." R.G. denied any physical or sexual abuse, or that his parents had any mental health conditions.

D.G. also spoke with the Department. She confirmed her prior account of the altercation on February 24, stating she was "not drunk," Brian "became physical towards her," and she scratched Brian "trying to protect myself." D.G. stated this was the "first domestic violence incident" but that Brian had been "verbally and emotionally abusive" in the past by "talk[ing] crap" and "becom[ing] mean," and she had wanted to "separate from him since last year." In the past week, D.G. said Brian "got in my face . . . [t]rying to get me to hit him." According to D.G., Brian also "wanted to get me alcohol" and "started to yell and said, [']I wish you['d] drink[']" because "[h]e thinks I'm not mean when I'm drinking. Yeah, because I'm either asleep or passed out." Because of these recent events, D.G. reported she had just obtained a temporary restraining order against Brian. D.G. had not yet served Brian with the restraining order or told him to move out, and she was reluctant to do so because "I feel bad that he's going to be in a shelter. He [does not] have anywhere to stay."

6

D.G. told the Department she was currently taking "medications for alcohol cravings," including Naltrexone as needed and Vivitrol every 30 days. D.G. had been taking this medication for one and a half years as prescribed by her primary care doctor. As for her alcohol use, D.G. started to drink at 21 years old but alcohol became a problem in her late 30s, "[a]fter I had [R.G.] and COVID." After giving birth to R.G., D.G. "used to fall asleep drinking about four times a week" and drinking "3-4 drinks." During the pandemic, D.G.'s drinking "increased" as she was "bored" and "depressed at home." D.G. denied any history of mental health issues.

D.G. reported she had been sober for about one-and-a-half years, after completing an inpatient program, until the night before the domestic violence incident when she "went to have some drinks with Brian." D.G. stated she did not have "any alcoholic drinks [on] the day of the incident" until after the fight was over, when she "grabbed a bottle and had a couple of drinks. I then called my family and they dumped the alcohol out." D.G. also reported drinking on Christmas Day 2023. D.G. stated that, as of the interview, she had been sober for 60 days and had not continued to drink because of support from her family, "AA meetings daily," and a three-week residential program. D.G. told the Department that Brian "caused her to relapse" because "[h]e gets under my skin. He didn't put the alcohol down my throat but he suggested me to go drinking this [past] Friday . . . and Tuesday . . . . I had to leave the house and go stay with my dad. When I'm sober I'm clear headed and he [doesn't] like that and I don't want him around."

D.G. reported that Brian drinks alcohol "[a]lmost daily" and "[w]hen I came back home from rehab the first time he wouldn't

7

stop drinking."  D.G. asserted that when Brian was drinking, she "wouldn't allow it in my home" and "[h]e was not allowed in my room."  But D.G. stated Brian had been sober for over 60 days due to an alcohol program.

Brian told the Department he had no history of domestic violence with D.G.  Brian maintained that D.G. was drunk on February 24, and "[s]he thought I was going to hit her but I was holding her back while she hit me."  Brian said about the incident, "I protected myself from her.  I blocked her from leaving.  I had bruises on me on my chest."  Brian stated that "I only pushed her away from me.  It has been many years of this happening.  Of me not knowing what to do."  Brian stated that in the past, D.G. was "drinking black out . . . typically leaving and not being stable."  Brian also reported that D.G. had declined to press criminal charges against him for the events of February 24.

Brian stated at the beginning of his relationship with D.G., they drank together on the weekends and their alcohol consumption "gradually increased."  Brian reported D.G. drank out of "depression and anxiety" and "could drink a few days at a time.  When depressed she will drink more.  I drink as well but in the evening.  She would drink in the daytime and at night when craving it."  According to Brian, when D.G. was drinking, he took care of all R.G.'s needs, including cooking, cleaning, and taking R.G. to school.  Brian said D.G. had been to three alcohol programs, her longest sober period was six months, and "[t]he last couple of times she has not lasted long."  Brian acknowledged that D.G. "says I'm a trigger" for her drinking "but in the past it could be issues at work.  It could be anything."  Brian stated, "Three weeks ago, [D.G.] was on the phone with her sponsor and she passed out on the phone with her.  I had to get the phone and

8

tell her sponsor she had been drinking.  She was really upset."
Brian believed D.G. had not drunk "[s]ince the beginning of
April."

As to his own alcohol use, Brian stated, "Over the past few
years, I never drank without my wife.  We drank together. . . .
Our relationship started to fizzle.  We were drinking 4-5 times a
week."  Brian was currently enrolled in his "first" alcohol
program and stated his intention was to continue alcohol
counseling and group therapy.  Brian stated his "trigger[]" for
drinking was "I always just drank with my wife.  Since all this
happened, I'm scared to drink."

The Department also interviewed I.P., D.G.'s adult son and
R.G.'s half-brother.  I.P. explained he did not live with D.G.
because "his life is in Long Beach and he would make more of an
effort if the drinking wasn't so bad."  I.P. stated D.G. "takes pills"
and he had seen her taking them in the past, but he did not
believe these pills were for a mental health condition.  I.P.
described that Brian "enable[d]" D.G. "but he is also the only one
that helps her and mom always takes Brian back."  I.P. did "not
expect a good outcome" from his mother's current participation in
rehab because "she has been in rehab at least 3 times, nothing
changes, and she has only been sober for eight months."  I.P. also
stated "there has been DV [domestic violence] in the past, [and]
his mom is usually the aggressor."  I.P "stated his brother [R.G.]
told him that Brian dragged his mother to [his] room, [and]
usually Brian is trying to prevent her from leaving and driving
drunk."

R.G.'s paternal grandmother stated that Brian told her
"[D.G.] had raised her hand at him" and the grandmother
"guess[ed]" Brian had also "laid a hand" on D.G.  The

9

grandmother described seeing "bites, scratches and a black eye" on Brian the previous summer "but he wouldn't let me take pictures of him to protect [D.G.]  He said he didn't want her to get in trouble."

The Department's report reflected that D.G. had two prior convictions for driving under the influence (DUI) in 2014 and 2015.  Brian was also arrested for DUI in October 2023, and the case was pending at the time of the dependency investigation. D.G. complied with drug and alcohol testing, testing positive for Oxazepam on March 26, 2024 and negative for any substances on April 19, 2024.

C.     *The Jurisdiction and Disposition Hearing*

The juvenile court held a jurisdiction and disposition hearing on May 23, 2024.  As to dependency jurisdiction, D.G.'s counsel argued that D.G. was non-offending, and the allegations of domestic violence (a-1 and b-1) should be dismissed or amended to reflect "violent conduct . . . on the part of the father against the mother."  As to allegation b-2 of D.G.'s substance use, counsel acknowledged D.G. was "a recent user or abuser of alcohol" but argued there was no evidence D.G. was drinking during the February 24 altercation.  Counsel further argued there was "no proof" D.G. abused prescription medication because D.G.'s positive drug test for benzodiazepine was explained by her prescription for "alcohol curbing medication."  Finally, counsel argued D.G. did not fail to protect R.G. from Brian's alcohol use because she was "protective and was sort of shielding the minor from father's drinking."

As to the disposition, D.G.'s counsel expressed "agreement with the full case plan, minus the psychiatric evaluation,"

10

because "[t]here's no indication or proof that mother has any type of mental health issues or any past diagnosis." Counsel also requested the court return R.G. to D.G.'s custody.

The Department asked the juvenile court to sustain the petition and remove R.G. from both parents. On allegations a-1 and b-1, the Department argued "both parents are aggressors," "it's mutual domestic violence by both of them," "they are aggressive with each other when they drink," and "they have codependency issues with each other." The Department informed the court that D.G. had failed to pursue the restraining order against Brian, and "once this restraining order dropped, father actually moved back into the home," raising "concerns that the parents still continue to have codependency issues and domestic violence issues."

As to allegation b-2, the Department contended D.G. had "a long history" of substance use that required "intensive" treatment. And on allegation b-3, the Department argued that "although father is involved in programming, it does appear the parents continue with the same behaviors," and "they call each other [their] triggers for abusing alcohol, yet they continue in their relationship with these issues and continue living together, it does not appear they learned very much yet."

Finally, the Department argued removal was warranted because "[R.G.'s] statements in the report are that he continues to be afraid of his parents and the way they fight and hurt each other. . . . [H]e has a bad feeling they're going to fight, again, and that he has to take care of himself when mom and dad drink." The Department requested a psychiatric evaluation for D.G. "to assess whether medication could help her. Again, she has been through a lot of rehabilitation and substance abuse treatment

11

and it does not seem to be working. She, herself, has stated that she has been depressed in the past, that is why she has been drinking. So in order for reunification to be a possibility and for this to really work, we want to be able to rule out any underlying issues, such as mental health."

The juvenile court sustained the petition as amended to allege that D.G. and Brian caused a risk of serious physical harm to R.G. and failed to protect R.G. (allegations a-1 and b-1), but the court struck the factual allegations that Brian "repeatedly struck" D.G., pulled D.G. by her hair, and pushed D.G. onto the bed. The court sustained allegation b-2 that D.G. was unable to care for R.G. due to substance abuse and that Brian failed to protect R.G. from D.G.'s substance abuse, but the court amended the allegation to reflect D.G. "has an unresolved history of alcohol abuse." The court also struck the factual allegation that D.G. was under the influence on February 24, 2024, but it also amended the allegation to include that "on prior occasions the mother was under the influence while the child was in her care." The court also sustained allegation b-3 regarding Brian's inability to care for R.G. due to substance abuse and D.G.'s resulting failure to protect R.G., and it amended the allegation to state "the father has an unresolved history of alcohol abuse which renders the father incapable."

With respect to disposition, the juvenile court declared R.G. a dependent of the court under section 300, subdivisions (a) and (b), and it found that return of R.G. to his parents' custody would create a substantial risk of detriment to his safety and wellbeing. The court reasoned that "the parents have been less than transparent about their substance abuse and although the[re] appears to be [domestic violence], it is probably fueled by

12

alcohol abuse on both sides, that kind of escalates to push and pull." While noting both parents were three months sober and "in programs," the court observed that "in violation of the restraining order, . . . the mother was not protective, and she allowed the father back into the home, so the court finds that they are also not willing to move forward to protect their child and to remain sober and away from one another since they both admit they are each other's triggers." The court ordered services for both parents, including drug and alcohol programs, parenting and individual counseling, domestic violence programs, and a psychiatric evaluation for D.G.

D.G. timely appealed. Brian also appealed, and his appointed appellate counsel filed a brief pursuant to *In re Phoenix H.* (2009) 47 Cal.4th 835, identifying no arguable issues for appeal. Brian declined to file a brief in propria persona raising any appellate issues, and his appeal was dismissed.[3]

---

[3]     D.G. does not challenge the jurisdiction findings against Brian, potentially rendering her appeal of the jurisdiction findings moot. (See *In re D.P.* (2023) 14 Cal.5th 266, 283 ["where jurisdictional findings have been made as to both parents but only one parent brings a challenge, the appeal may be rendered moot"].) We determine, however, that D.G.'s appeal is not moot because she challenges the jurisdiction findings against her and the resulting disposition order incorporating those findings. "[W]here a jurisdictional finding 'serves as the basis for dispositional orders that are also challenged on appeal' [citation], the appeal is not moot." (*Id.* at p. 283; see *id.* at p. 277 ["reversal of [a] jurisdictional finding calls into question the validity of orders based on the finding"].)

13

## DISCUSSION

### A.    *Jurisdiction Findings*

D.G. argues there was no substantial evidence supporting the jurisdiction findings against her.  She contends there was no evidence that she engaged in domestic violence against Brian or "mutual combat" with Brian, and she further contends she was not a current abuser of alcohol at the time the petition was filed.

#### 1.    *Governing Law and Standard of Review*

Section 300, subdivision (a), establishes dependency jurisdiction if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian."  As relevant here, subdivision (b)(1) of the same section gives the court jurisdiction over the child if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . [t]he failure or inability of the child's parent or guardian to adequately supervise or protect the child" or "[t]he inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's . . . substance abuse."  (§ 300, subds. (b)(1)(A), (b)(1)(D).)  The juvenile court makes jurisdiction findings by a preponderance of the evidence.  (See § 355, subd. (a); see also *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248 (*Cynthia D.*).)

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdiction findings . . . , we determine if substantial evidence, contradicted or uncontradicted, supports them.  "In making this determination, we draw all reasonable

14

inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] "'[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate].'"'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

It is the appellant's burden to "'demonstrate there is no evidence of a sufficiently substantial nature to support the findings.'" (*In re Lana S.* (2012) 207 Cal.App.4th 94, 103; accord, *In re Jordan R.* (2012) 205 Cal.App.4th 111, 135-136.) Substantial evidence is "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion; it is evidence which is reasonable in nature, credible, and of solid value." (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433; accord, *In re Jerry M.* (1997) 59 Cal.App.4th 289, 298.)

2.      *Substantial Evidence Supports the Juvenile Court's Finding of Domestic Violence by D.G.*

Substantial evidence supports the juvenile court's finding that D.G. engaged in domestic violence with Brian in R.G.'s presence. D.G. reported to police after the incident on February 24 that the "physical altercation moved from [her] bedroom into [R.G.]'s bedroom, where [R.G.] was present" and while there, "Brian pushed [her] onto [R.G.]'s bed" and D.G.

15

"scratche[d]" Brian's "face and upper body." R.G. stated to police that he saw his mother and father "push[] and hit each other." R.G. later reported to the Department that when his parents argued, "Mom hit[s] dad . . . [o]n the face with her hands. She slaps him." R.G. also stated D.G. would "be drunk and . . . fight dad" but dad "doesn't really do anything to mom." R.G. reported that he felt only "[a] little" safe living with his parents because he "ha[d] a bad feeling they [were] going to fight again."

Brian also told police D.G. "punched him and pushed him," and that she had "assaulted him previously." The police report documented injuries to Brian's cheek, nose, neck, chest, and stomach. Brian later stated to the Department that D.G. "thought I was going to hit her but I was holding her back while she hit me," "I protected myself from her," and "I only pushed her away from me." D.G.'s son I.P. and the paternal grandmother gave similar accounts. I.P. told the Department he had talked with R.G., he knew about domestic violence between Brian and D.G., and "his mom is usually the aggressor." Paternal grandmother said Brian had told her that "[D.G.] had raised her hand at him," and she had seen previous injuries on Brian.

These statements constitute substantial evidence for the juvenile court's finding that D.G. engaged in domestic violence against Brian.[4] (See *In re M.M.* (2015) 240 Cal.App.4th 703, 706, 720 [sufficient evidence for § 300, subd. (a), jurisdiction finding based on "domestic violence by both mother and father" in the child's presence, where father choked mother and mother hit and

---

[4] D.G. does not argue there was insufficient evidence that the domestic violence between her and Brian presented a risk of nonaccidental physical harm to R.G. (See *In re Cole L.* (2021) 70 Cal.App.5th 591, 602-604.)

kicked father]; *In re T.V.* (2013) 217 Cal.App.4th 126, 134-135 [same, based on child's report that "she saw her parents fighting . . . felt scared and described how they hit each other"]; cf. *In re B.H.* (2024) 103 Cal.App.5th 469, 483 [insufficient evidence for jurisdiction finding of domestic violence by mother based on "conclusory" statements that mother was "'very violent'" or "'verbally aggressive'"].)

D.G. argues the Department "mask[ed] the facts of the February 24, 2024, domestic violence perpetrated by father against mother to make it look like a mutual combat, when mother was clearly the victim." D.G. asserts the police report "conclud[ed] that mother was sober and was the victim of father's perpetrated violence and false imprisonment . . . where he not only physically abused her, but also hid her car keys, mobile phone, and wallet to restrict access to the world." She contends "Father was arrested for these crimes against mother" because "the police officer concluded that father's story did not match that of mother's and [R.G.]'s" and D.G. was also able to "obtain[] a restraining order to remove father from the family home."

Brian and D.G. gave different accounts of the February 24 incident, describing each other as the aggressor. And the juvenile court found Brian engaged in domestic violence against D.G. But as stated, there was also sufficient evidence for the court to find D.G. engaged in violence against Brian. By arguing that she did not, D.G. asks us to revisit questions of credibility and to reweigh conflicting evidence. As a reviewing court, we are bound to accept the juvenile court's resolution of credibility issues and evidentiary conflicts. (See *In re I.J.*, *supra*, 56 Cal.4th at p. 773; *In re Lana S.*, *supra*, 207 Cal.App.4th at p. 103.)

17

3.    *Substantial Evidence Supports the Finding D.G. Abused Alcohol*[5]

Substantial evidence also supports the juvenile court's finding that D.G. at the time of the jurisdiction and disposition hearing had an unresolved history of alcohol abuse affecting her ability to regularly care for R.G. within the meaning of section 300, subdivision (b).  D.G. contends the record is "unequivocal[]" that "she sought treatment for her past alcohol addiction and was sober for one year and a half prior to the petition."  D.G. also argues that at the time of the hearing, she was "currently enrolled in an outpatient substance abuse treatment program, [and] provided negative alcohol tests."

D.G.'s efforts toward sobriety are commendable.  Other record evidence, however, indicates D.G.'s alcohol abuse was unresolved, affecting her ability to care for R.G.  D.G. acknowledged she had "a problem" with drinking since R.G.'s birth in 2015, that it got worse after 2020, and that she had a history of residential alcohol treatment and prescription medication for substance use.  Despite her treatment, D.G. disclosed drinking the night before and the night of the February 24 altercation.  Although D.G. denied drinking on the morning of the altercation, Brian maintained she was drunk at

_____

[5]    While we could affirm dependency jurisdiction solely on the sufficiency of the domestic violence allegations (see *In re I.J.*, *supra*, 56 Cal.4th at p. 773)*,* we additionally review the substance abuse allegations because D.G. asserts "non-review of these challenged findings can have lasting consequences on mother, who is a teacher in a local school."  (See *In re D.P.*, *supra*, 14 Cal.5th at pp. 283-284 [merits review warranted where "a parent has demonstrated a specific legal or practical consequence" of the jurisdictional findings].)

18

the time they fought.  R.G. likewise told the Department that his mother was drunk while fighting with his dad.  R.G. could tell D.G. was drunk because of "her expressions," and because she "gets crazy" and "says weird things."  When D.G. was drinking, R.G. said he took care of himself, and Brian asserted he cared for R.G.

Brian also stated that D.G.'s longest sober period was six months, she had tried three alcohol treatment programs, and her most recent attempts at sobriety "ha[d] not lasted long." Brian described a pattern of D.G. "denying she is drinking" to him and her family.  Brian reported that D.G. was having difficulty with her current alcohol treatment program because she "passed out" from drinking while on the phone with her sponsor.  I.P. similarly stated that D.G. had tried alcohol treatment at least three times and she had only been sober for eight months at a time.  I.P. expressed strain in his relationship with D.G. because her drinking was "so bad" and said he "d[id] not expect a good outcome" from D.G.'s current treatment program.  And although D.G. reported she had been sober for a year and a half before the dependency referral occurred, she also admitted to drinking approximately two months earlier during Christmas of 2023.

Evidence from D.G.'s family describing that her recovery from alcohol abuse was incomplete and affected her ability to care for R.G. was substantial evidence for a jurisdiction finding under section 300, subdivision (b).  (See *In re R.R.* (2010) 187 Cal.App.4th 1264, 1270, 1284 [substantial evidence for § 300, subd. (b), finding where father had "a long history of [substance] use" and recent serious incidents of use, and mother reported father lied about his recent use]; *In re Alexis E.* (2009)

19

171 Cal.App.4th 438, 453 [same, where father's substance abuse had "a negative effect on his demeanor towards the children and others," including violence, yelling, and disregarding children's needs]; *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1657-1658 [same, where mother's substance use "intensifies an unstable emotional condition" causing "angry confrontations with other people," and "mother is in denial about . . . her substance use"]; cf. *In re Gilberto G.* (2024) 105 Cal.App.5th 52, 67 [insufficient evidence of mother's alcohol abuse where "her children said she did not act 'weird' or drink alcohol in their presence" and "her husband and mother said she did not abuse alcohol"].)

The juvenile court was entitled to credit this evidence over D.G.'s assertion that her alcohol use was under control, and as stated, we must accept the juvenile court's resolution on this point. (See *In re I.J.*, *supra*, 56 Cal.4th at p. 773 [""issues of fact and credibility are the province of the trial court""].)

B.    *Disposition Orders*

D.G. also argues the court lacked substantial evidence to remove R.G. from her custody and to order a psychiatric evaluation.

1.    *Governing Law and Standard of Review*

Section 361, subdivision (c)(1), permits removal of a dependent child from a parent's custody if "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (See *In re*

*D.B.* (2018) 26 Cal.App.5th 320, 328.) "The juvenile court is statutorily required to determine 'whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home' and 'shall state the facts on which the decision to remove the minor is based.' (§ 361, subd. (e).)" (*In re L.O.* (2021) 67 Cal.App.5th 227, 246-247.) The juvenile court should consider "not only the parent's past conduct, but also current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re I.R.* (2021) 61 Cal.App.5th 510, 520.) Removal must be based on "clear and convincing evidence." (§ 361, subd. (c); see *Cynthia D., supra*, 5 Cal.4th at p. 248.)

When the juvenile court orders a child removed from a parent, we review for substantial evidence, "'"keeping in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence."' [Citation.] '[A]ppellate review of the sufficiency of the evidence in support of a finding requiring clear and convincing proof must account for the level of confidence this standard demands.'" (*In re M.V.* (2022) 78 Cal.App.5th 944, 960; accord, *In re I.R., supra*, 61 Cal.App.5th at p. 520.)

Additionally, "[s]ection 362, subdivision (d) authorizes the juvenile court to 'direct any reasonable orders to the parents' of a dependent child as the court seems necessary and proper to ensure appropriate care, supervision, custody, conduct, maintenance, and support of the child [citation], and the juvenile court enjoys broad discretion in crafting a dispositional case plan to this end." (*In re I.R., supra*, 61 Cal.App.5th at p. 522; accord, *In re D.P.* (2020) 44 Cal.App.5th 1058, 1071.) "We review the juvenile court's disposition orders for an abuse of discretion (*In re*

*Gabriel L.* (2009) 172 Cal.App.4th 644, 652), and review for substantial evidence the findings of fact on which the dispositional orders are based. (*In re Francisco D.* (2014) 230 Cal.App.4th 73, 80.)" (*In re K.T.* (2020) 49 Cal.App.5th 20, 25.)

2. *Substantial Evidence Supports the Juvenile Court's Disposition Order*

D.G. argues there was no substantial evidence supporting the juvenile court's order removing R.G. from her custody. D.G. argues that before removing a child from a custodial parent, the juvenile court must consider other "reasonable means to protect the minor," including "[t]he option of removing an offending parent . . . from the home." (§ 361, subd. (c)(1)(A).) D.G. further argues "she was the victim of the violence perpetrated by father and [she] posed no risk of physical harm against her child," thus the juvenile court could prevent R.G.'s removal from D.G. by ordering Brian to leave the family home. D.G. asserts that she had pursued a restraining order against Brian, allowing R.G. to remain in her custody without risk of physical harm.

As discussed in section B.2. of the Discussion, substantial evidence supported the juvenile court's finding that D.G. and Brian engaged in domestic violence against each other in R.G.'s presence. This presented a substantial danger to R.G.'s wellbeing, supporting removal. (See *In re V.L.* (2020) 54 Cal.App.5th 147, 156 [affirming disposition order of removal because "[e]ven if a child suffers no physical harm due to domestic violence, a 'cycle of violence between . . . parents constitute[s] a failure to protect [a child] "from the substantial risk of encountering the violence and suffering serious physical

22

harm or illness from it"'"]; *In re T.V.*, *supra*, 217 Cal.App.4th at p. 136 [same, "because the evidence showed the parents engaged in a pattern of domestic violence, some of which [child] heard or saw; thus, she was at substantial risk of harm if returned home"].) Although D.G. claims the restraining order against Brian eliminated any risk to R.G., at the time of the disposition hearing, D.G. had "violated" then "dropped" the restraining order and Brian had moved back into the family home. (Cf. *In re I.R.*, *supra,* 61 Cal.App.5th at p. 521 [substantial evidence did not support removal based on "domestic violence between Mother and Father" where parents maintained distance after dependency proceedings began and did not seek to reunite].)

Additionally, while D.G. and Brian were participating in substance use treatment, the court found both parents still had unresolved issues with alcohol abuse, "trigger[ed]" by each other and "fuel[ing]" their pattern of domestic violence. Nevertheless, D.G. allowed Brian to move back into the family home, while reporting that Brian was still "suggest[ing] [she] go drinking," getting "in [her] face," and "[t]rying to get [her] to hit him." That the parents' cohabitation could exacerbate their unresolved alcohol abuse and escalate into domestic violence further supported a finding of substantial danger to R.G.'s wellbeing and removal. (See *In re H.B.* (2024) 106 Cal.App.5th 219, 242 [affirming removal findings where "[f]ather's recent period of sobriety" within lengthy "history of substance abuse" indicated "early stages of recovery" with "risk of relapsing"].)

D.G. cites *In re D.P.*, *supra*, 44 Cal.App.5th 1058, which held the juvenile court failed to consider alternatives to removing a child from his mother's custody. (See *id.* at p. 1068.) In that case, after dependency proceedings began, the father obtained a

23

restraining order against the offending mother, and the mother moved out of the family home.  (See *id.* at p. 1069.)  But unlike *In re D.P.*, where the restraining order was "active" at the time of disposition (suggesting removal was unnecessary), D.G.'s restraining order against Brian was no longer in effect and both parents were living at home when the court ordered the removal of R.G.  (*Ibid.*)

The juvenile court did not abuse its discretion in ordering a psychiatric evaluation of D.G.  D.G. contends the dependency allegations concerned only "domestic violence and alcohol abuse, and had no relation to [her] mental health."  While D.G. denied "any history of mental health issues," she also acknowledged that her drinking had "increased" when she was "depressed at home."  Brian corroborated that D.G. "suffered from depression and anxiety" and would drink more "[w]hen depressed."  As the Department noted at disposition, this evidence suggested mental health treatment might assist with addressing D.G.'s years-long history of alcohol abuse.  "At disposition, the juvenile court is not limited to the content of the sustained petition when it considers what dispositional orders would be in the best interests of the child[].  [Citations.]  Instead, the court may consider the evidence as a whole."  (*In re Briana V.* (2015) 236 Cal.App.4th 297, 311; accord, *In re K.T.*, *supra*, 49 Cal.App.5th at p. 25 [juvenile court has discretion "to formulate disposition orders to address parental deficiencies when necessary to protect and promote the child's welfare, even when that parental conduct did not give rise to the dependency proceedings"]; *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1007-1008.)  The juvenile court did not abuse its discretion by ordering a psychiatric evaluation based on the evidence before it.  (See *In re D.P.*, *supra*, 44 Cal.App.5th at

24

p. 1072 [affirming court's order of domestic violence program for mother based on child's report of violence by mother]; *In re Briana V.*, at pp. 311-312 [no abuse of discretion ordering sexual abuse counseling for father, despite lack of sexual abuse allegations, because "father was a registered sex offender"]; cf. *In re Sergio C.* (1999) 70 Cal.App.4th 957, 960 [court erred by imposing drug testing order for father based solely on "uncorroborated allegation" of mother, "an admitted drug addict"].)[6]

## DISPOSITION

The juvenile court's jurisdiction and disposition orders are affirmed.

MARTINEZ, P. J.

We concur:

SEGAL, J.                    FEUER, J.

---

[6] For the first time on reply, D.G. argues the juvenile court's orders violate the federal Violence Against Women Act (42 U.S.C. § 13981 et seq.) because they stem from D.G.'s report to police of Brian's domestic violence. D.G.'s argument is forfeited, and we decline to reach it. (See *In re R.Q.* (2023) 96 Cal.App.5th 462, 470 [""We will not ordinarily consider issues raised for the first time in a reply brief.""].)